838 F.2d 835
 27 ERC 1281, 94 A.L.R.Fed. 733, 18
Envtl. L. Rep. 20,502
 NATIONAL-SOUTHWIRE ALUMINUM CO., Petitioner-Appellant,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; Lee A.
Thomas, Administrator; and Jack E. Raven,
Regional Administrator, Respondents-Appellees.
 No. 86-3982.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 4, 1987.
Decided Feb. 1, 1988.
Rehearing and Rehearing En Banc Denied March 25, 1988.
 
 Chester R. Babst, III, argued, Steven H. Haake, Babst, Calland, Clements, & Zomnir, Pittsburgh, Pa., for petitioner-appellant.
 Lee A. Thomas, Adm. EPA, Joseph M. Feller, argued, Earl C. Salo, Brian V. Faller, Lead Counsel, Envir. Defense Section, Land & Natural Resources, U.S. Dept. of Justice, Washington, D.C., Jack E. Raven, Reg. Adm. EPA, Atlanta, Ga., for respondents-appellees.
 Before GUY and BOGGS, Circuit Judges; and WOODS, District Judge.*
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 National-Southwire Aluminum Company (NSA) petitions this court for review of a determination by the United States Environmental Protection Agency (EPA) that the turning off of certain pollution control equipment (i.e., wet scrubbers) at NSA's aluminum reduction plant in Hawesville, Kentucky, would constitute a "modification" of a stationary source within the meaning of section 111(a)(4) of the Clean Air Act, 42 U.S.C. Sec. 7411(a)(4). If turning off the equipment is such a modification, the plant would be subject to the New Source Performance Standards (NSPS) promulgated by the EPA pursuant to section 111(b) of the Act, 42 U.S.C. Sec. 7411(b), which, NSA claims, could only be met by tearing out the wet scrubbers and installing a new system utilizing dry scrubbers at a prohibitive expense.
 
 
 2
 The EPA's determination was issued pursuant to 40 C.F.R. Sec. 60.5 which requires the Agency, at the request of an owner or operator of a source of pollution, to determine whether a proposed action would be a modification of the source. The EPA's determination is a final agency action subject to judicial review in the court of appeals under section 307(b)(1) of the Clean Air Act, 42 U.S.C. Sec. 7607(b)(1). The standard of review of an EPA determination of NSPS applicability is specified in the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A), which provides that agency action may be set aside only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Because we do not find the EPA's determination here to have been arbitrary or capricious, the petition will be denied.
 
 I.
 
 3
 NSA owns and operates a primary aluminum reduction plant which emits fluoride in both gaseous and particulate forms. The EPA has determined that fluoride air pollution presents a serious threat to public welfare by injuring natural vegetation, herbivorous animals, and agricultural crops. See 39 Fed.Reg. 37,730 (1974).[1] As a welfare-related pollutant, regulation of fluoride emissions is based upon the requirements of section 111(d) of the Act, which provides in pertinent part that:
 
 
 4
 [E]ach State shall submit to the Administration a plan which (A) establishes standards of performance for any existing source for any air pollutant (i) for which air quality criteria have not been issued ... but (ii) to which a standard of performance under this section would apply if such existing source were a new source, and (B) provides for the implementation and enforcement of such standards of performance.
 
 
 5
 42 U.S.C. Sec. 7411(d).
 
 
 6
 The EPA promulgated NSPS for fluoride emissions from new and modified primary aluminum reduction plants on October 23, 1974. See 39 Fed.Reg. 37,73 0. Kentucky was then required, under section 111(d), to adopt state standards to limit fluoride emissions from existing, unmodified plants, which included NSA. At the time of construction of the plant in 1969, before passage of the Clean Air Act, NSA equipped the plant with wet scrubbers, which represented the best known technology at that time for the control of emissions of gaseous fluoride. Kentucky adopted its standards in 1981 and the EPA approved Kentucky's standards in 1982. These standards did not require NSA to reduce the gaseous fluoride emissions from its Hawesville plant but simply required the same level of emission control that NSA had been achieving with its wet scrubbers since 1969.[2]
 
 
 7
 In 1982, during a routine maintenance-related shutdown of the wet scrubbers, NSA observed that its ambient air monitors did not detect any appreciable change in ambient fluoride levels as a result of not scrubbing the exhaust gases.[3] Because of the substantial cost of operating the wet scrubbers, NSA sought and obtained from Kentucky a relaxation of the state's section 111(d) standard by a factor of thirteen, from 1.0 pounds of fluoride emitted per ton of aluminum produced to 290 pounds of fluoride emitted per hour, the equivalent of 13.18 pounds of fluoride per ton of aluminum. This action results in increasing gaseous fluoride emissions from the plant by 1,174 tons per year. This relaxation is not effective, however, unless and until it is approved by the EPA. See 40 C.F.R. Secs. 60.23, 60.27.
 
 
 8
 Kentucky submitted a proposed form of its relaxed 111(d) standard to the EPA for comment on March 22, 1985. This proposed regulation included a stipulation to the effect that if NSA turned off the wet scrubbers at its plant to take advantage of the relaxed section 111(d) standard, such a change in method of operation would not be considered a "modification" that would render the plant subject to the NSPS.[4] Section 111(a)(4) of the Act defines a modification as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source." Despite having been informed by the EPA that this latter stipulation would not be approved, the revised standard submitted for final approval on April 3, 1986, included the stipulation.
 
 
 9
 On August 27, 1986, the EPA received NSA's request for a formal determination of whether the turning off of the wet scrubbers would be a modification that would trigger application of the NSPS. In making its request, NSA argued that such change should not be considered a modification because (1) pollution control equipment is not part of a "stationary source," and therefore turning off such equipment is not a modification of such a source, and (2) NSA's plant is an existing facility subject to state regulation under section 111(d) and therefore cannot be subject to the NSPS.
 
 
 10
 On September 22, 1986, the EPA issued the determination which is the subject of this appeal. The Agency concluded that, under the plain words of the statute, pollution control equipment is part of a stationary source, and changes in such equipment that cause increases in emissions are modifications of the source within the meaning of section 111 (a)(4). It also determined that, under the plain words of both the statute and the EPA's regulations, an existing facility becomes subject to the NSPS when it undergoes a modification. On December 2, 1986, the EPA issued a notice of proposed rulemaking (51 Fed.Reg. 43,395) proposing to approve Kentucky's relaxed standard but to take no action on the purported exemption from application of the NSPS since that provision is outside the scope of state regulation authorized by section 111(d). The proposed approval was based on the statutory scheme which gives substantial latitude to the states in setting emission standards for welfare-related pollutants generated by local facilities but does not speak directly to the potential impact of other sections of the Act on revisions of those standards.
 
 II.
 
 11
 Our standard of review is a deferential one that presumes the validity of agency action. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-16, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The EPA determination under review in this case hinges on the interpretation of section 111 of the Clean Air Act and of the EPA's regulations implementing that section. The Supreme Court has established a two-step procedure for judicial review of statutory construction by an administrative agency. "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter...." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2782 (footnote omitted). "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Id. at 844, 104 S.Ct. 2782 (footnote omitted).
 
 
 12
 This court has recognized the mandate of the Supreme Court that " 'great deference' be accorded the 'interpretation given [a] statute by the officers or agency charged with its administration.' " McCown v. Secretary of HHS, 796 F.2d 151, 157 (6th Cir.1986) (quoting Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). We have observed that, in reviewing agency action under section 706 of the Administrative Procedure Act, "[w]e are, therefore, normally 'bound by the principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.' " United States Air Force v. FLRA, 681 F.2d 466, 467 (6th Cir.1982) (quoting Miller v. Youakim, 440 U.S. 125, 145 n. 25, 99 S.Ct. 957, 969 n. 25, 59 L.Ed.2d 194 (1979); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)).
 
 
 13
 In this case, the EPA's interpretation of the Clean Air Act is embodied in its regulations. The Agency's interpretation of its own regulations is entitled to special deference. " 'When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.' " Compton v. Tennessee Dep't of Public Welfare, 532 F.2d 561, 565 (6th Cir.1976) (quoting Udall, 380 U.S. at 16-17, 85 S.Ct. at 801). As this court and the Supreme Court have explained:
 
 
 14
 Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... "[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."
 
 
 15
 Compton, 532 F.2d at 565 (quoting Udall, 380 U.S. at 16-17, 85 S.Ct. at 801; Bowles v. Seminole Rock Co., 325 U.S. 410, 413-14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).
 
 III.
 NSA raises three arguments on appeal:
 
 16
 1. an emission control system is not included within the statutory definition of a "stationary source";
 
 
 17
 2. the proposed change in the operation of NSA's emission control system does not constitute a "modification" of an existing facility; and
 
 
 18
 3. the imposition of NSPS would be inconsistent with the legislative intent behind section 111 of the Clean Air Act and regulations thereunder.
 
 
 19
 NSA claims that a "stationary source" consists only of pollution generating equipment, and does not include attached air pollution control equipment. Therefore, it argues, the turning off of its wet scrubbers would not constitute a "modification" of a "stationary source." Under this theory, the existence of a modification would depend on the amount of pollutant created by the pollution-generating equipment, without regard to the amount of pollution actually emitted into the atmosphere after the pollution-control equipment has done its work.
 
 
 20
 Section 111(a)(4) of the Act, 42 U.S.C. Sec. 7411(a)(4) provides:
 
 
 21
 The term "modification" means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.
 
 
 22
 Section 111(a)(3), 42 U.S.C. Sec. 7411(a)(3), defines the term "stationary source" as "any building, structure, facility, or installation which emits or may emit any air pollutant." Clearly, while the statutory definition does not specifically reference or include pre-existing pollution control equipment, it certainly does not exclude it either. Moreover, the EPA explicitly considered and rejected NSA's theory when the agency amended the applicable regulations in 1975. The current regulations define "modification" to include any change in the method of operation of "an existing facility which increases the amount of any air pollutant ... emitted into the atmosphere...." 40 C.F.R. Sec. 60.2. See also 40 C.F.R. Sec. 60.14(a) (any change "which results in an increase in the emission rate to the atmosphere " constitutes a modification (emphasis added)). As the EPA explained at the time it proposed the amendments:
 
 
 23
 The new phrase ['emitted into the atmosphere'] clarifies that for an existing facility to undergo a modification there must be an increase in actual emissions.... The Administrator considered defining "modification" so that increases in pre-controlled (potential) emissions would be modifications. However, the proposed definition of modification is limited to increases in actual emissions.
 
 
 24
 39 Fed.Reg. 36,946 (October 15, 1974). As the agency further explained:
 
 
 25
 If any increase in emissions that would result from a physical or operational change to an existing facility can be offset by improving an existing control system for that facility, such a change would not be considered a modification because there would be no increase in emissions to the atmosphere.
 
 
 26
 Id. It is clear from the foregoing that the agency considered such a definition to be a limiting one which would allow a facility to change or add to its operation such that increased pollution would be generated but would not constitute a modification provided such increase were offset by a corresponding increase in the effectiveness of its pollution control mechanisms. These regulations were duly promulgated by the agency on December 16, 1975, and may not be challenged in this appeal.[5] As a result, we find the agency's interpretation of the term "stationary source" as including a structure's pollution control equipment to be reasonable and not inconsistent with the statutory language.
 
 
 27
 NSA next argues that its proposed change in operations falls within the following regulatory exception to the definition of "modification":
 
 
 28
 The following shall not, by themselves, be considered modifications under this part:
 
 
 29
 ....
 
 
 30
 (5) The addition or use of any system or device whose primary function is the reduction of air pollutants, except when an emission control system is removed or is replaced by a system which the Administrator determines to be less environmentally beneficial.
 
 
 31
 40 C.F.R. Sec. 60.14(e)(5). Although NSA did not specifically raise this argument below, we will address it here since the governing regulation, 40 C.F.R. Sec. 60.5, requires the Administrator to render a decision on whether a proposed action will constitute a modification "within the meaning of this part," and the exception NSA now urges is contained within part 60.
 
 
 32
 NSA's proposal to turn off a portion of its air pollution control equipment does not fit within the delineated exception. By its terms, the regulation does not apply to the removal of such a system, nor to the replacement of such a system with one that is "less environmentally beneficial." The purpose of this de minimis exception is to permit a source to install a pollution control system that would bring about a major decrease in emissions of one pollutant while causing a smaller, incidental increase in emissions of another pollutant. "The exemption ... would exempt changes such as the addition of an afterburner to a control system to reduce odors even though particulate emissions may increase due to the afterburner." 39 Fed.Reg. 36,948 (October 15, 1974). Rather than an "addition or use" of a pollution control system, NSA's proposal contemplates the non-use, or subtraction of a pollution control device, i.e., the wet scrubbers.
 
 
 33
 It should be noted that this "replacement" system would leave gaseous fluorides virtually uncontrolled.[6] Such result would be incompatible with a major purpose of the Clean Air Act--to prevent or minimize any increases in existing levels of pollution. This philosophy is embodied in 42 U.S.C. Sec. 7411(b), which authorizes a system of nationally uniform emission standards that apply to both newly-constructed sources of pollution and to existing sources that increase their emissions. ASARCO, Inc. v. EPA, 578 F.2d 319, 321-22 (D.C.Cir.1978). This purpose was unequivocally expressed by Congress. "The maximum use of available means of preventing and controlling air pollution is essential to the elimination of new pollution problems while cleaning up existing sources." S.Rep. No. 1196, 91st Cong., 2d Sess. at 16, reprinted in 1 Senate Committee on Public Works, A Legislative History of the Clean Air Act Amendments of 1970, at 416. "[T]he emission standards shall provide that sources of such emissions shall be designed and equipped to prevent and control such emissions to the fullest extent compatible with the available technology and economic feasibility." H.R.Rep. No. 1146, 91st Cong., 2d Sess., at 10, reprinted in 1970 U.S.Code Cong. & Admin.News 5356, 5365.
 
 
 34
 It is inconsistent with the Congressional purpose of maximum feasible control to have existing, functional air pollution control equipment sitting idle while the pollution that the equipment could be preventing escapes into the atmosphere. The turning off of NSA's wet scrubbers would result in an increase of 1,174 tons per year of fluoride emissions with no decrease whatsoever in the emission of any other pollutant.[7] It is apparent that such a changed system would be substantially "less environmentally beneficial" and cannot be deemed so de minimis as to qualify it for exemption under 40 C.F.R. Sec. 60.14(e)(5).[8]
 
 
 35
 Finally, NSA argues that imposition of the NSPS under the facts of this case would be inconsistent with the purposes of section 111 of the Act. In essence it argues that, since the states have been given primary responsibility for developing and enforcing control plans under section 111(d), the imposition of NSPS under section 111(b) would undermine the states' authority under section 111(d). As we have noted, section 111(b) was "designed to prevent new [air] pollution problems" by regulating both newly-constructed sources of pollution and sources that increase their emissions. National Asphalt Pavement Ass'n v. Train, 539 F.2d 775, 783 (D.C.Cir.1976). The effect of including modified as well as newly-constructed sources under its provisions is to establish existing levels of emissions as a baseline above which an existing source may not pollute without becoming subject to the NSPS. As the Court of Appeals for the District of Columbia has explained:
 
 
 36
 [T]he operator of an existing facility can make any alterations he wishes in the facility without becoming subject to the NSPS as long as the level of emissions from the altered facility does not increase. Thus, the level of emissions before alterations take place ... effectively defines the standard that an altered facility must meet.
 
 
 37
 ASARCO, 578 F.2d at 328-29 (emphasis in original).
 
 
 38
 Section 111(d) requires states to develop, and submit to the EPA for approval, plans that include measures for the reduction of emissions from unmodified, existing sources, of those pollutants for which the EPA has not promulgated national ambient air quality standards, but for which the Agency has promulgated NSPS under section 111(b). In this case, Kentucky's first section 111(d) standard was adopted in 1981 and required nothing more of NSA than to continue operating the scrubbers as it had been doing. NSA now claims that because Kentucky adopted its original standard "in error" and now wishes to relax that standard further, it should be exempt from the NSPS. If accepted, this argument would render the "modification" provisions of section 111(b) meaningless by authorizing unlimited increases in emissions from existing sources so long as the increases do not violate state standards under section 111(d). However, it is clear that Congress intended that federal enforcement of federal air pollution standards governing new or modified stationary sources not be controlled by the states. United States v. City of Painesville, 431 F.Supp. 496, 501 n. 9 (N.D.Ohio 1977), aff'd, 644 F.2d 1186 (6th Cir.), cert. denied, 454 U.S. 894, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981) (state law may not determine what sources are subject to NSPS). See also National Asphalt, 539 F.2d at 785 (state regulations designed to reduce emissions do not preempt EPA authority to prevent increases).
 
 
 39
 The EPA's determination will require NSA either to continue operating its existing wet scrubbers (and thereby avoid application of the NSPS) or to install new control equipment. If, as NSA claims, the latter option is prohibitively expensive, then presumably the company will choose the former option. In contrast to NSA's proposed plan permitting vastly increased fluoride emissions, either of the above options will further the Act's stated purpose of protecting and enhancing the quality of the nation's air by virtue of increased federal participation. ASARCO, 578 F.2d at 321 (citing Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 64, 95 S.Ct. 1470, 1474, 43 L.Ed.2d 731 (1975)).
 
 
 40
 In conclusion, since we find the EPA's interpretation of the governing statute and implementing regulations rational and consistent with the purposes that inspired the Clean Air Act, NSA's petition will be DENIED.
 
 
 41
 BOGGS, Circuit Judge, dissenting.
 
 
 42
 This case involves assessing EPA's resolution of a conflict between two principles of the Clean Air Act. The first principle is that individual states are allowed to set their own "welfare-related" standards for pollution, though not health-related standards. That is, states can decide for themselves what costs they wish to impose for what level of protection of vegetation and inanimate objects. This policy is clearly spelled out in Section 111(d) of the Clean Air Act, 42 U.S.C. Sec. 7411(d).
 
 
 43
 The second policy is that nationwide New Source Performance Standards (NSPS) should apply to new or "modified" sources of pollution, so as to address pollution problems when those problems are easiest to fix, at the time of the new construction. See Section 111(b) of the Clean Air Act, 42 U.S.C. Sec. 7411(b). In the particular case before us, the first principle can be accommodated without any significant damage to the second. EPA's resolution of this controversy does not do that. Rather, it exalts formalistic rather than actual adherence to the second principle, while completely vitiating the first. I think this is an unreasonable construction of the agency's authority and thus violates the standard set forth in Chevron v. Natural Resources Defense Council, 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984). With regard to the application of the NSPS to a change in the operation of a pollution control system, I cannot find that "the Administrator's view that it is appropriate in the context is a reasonable one." Ibid. I therefore respectfully dissent.
 
 
 44
 It is important to recognize that the current conflict is, in effect, an accident of timing. National Southwire originally installed its wet scrubbers in 1969 voluntarily. Had it not installed them in 1969, it would not have been subject to a requirement to do so until December 1981. Had it simply challenged enforcement of those first Kentucky standards, it could almost certainly have delayed until Kentucky proposed its new standards, without having to install the pollution control equipment it now has in place. It then cheerfully would have been granted the exemption it seeks, for failure to install the scrubbers would not be a "modification." As early as March 1983, Kentucky granted an exemption permitting operation without wet scrubbers. No decrease in ambient air quality was noted during three years of operation without the scrubbers.
 
 
 45
 Similarly, had Kentucky in December 1981 taken the position which Kentucky now takes (and took as early as March 1983), the company would clearly not be forced to operate the wet scrubbers.
 
 
 46
 A state is free, with EPA approval, to reduce the welfare-related standards that it sets for pollution, and Kentucky would have been free to set originally the standard for which it has now obtained EPA's approval. Thus, EPA's interpretation in two ways applies a "minnow-trap" type of enforcement, where any step at any time towards pollution control is fatal to any effort at later reevaluation. It minnow-traps this particular facility for its early and voluntary pollution control activity and also effectively minnow-traps Kentucky for having initially taken a more stringent approach, even though Kentucky now deems its earlier policy unwise.
 
 
 47
 As a general matter, this hardly seems a sensible strategy. It might conceivably achieve some actual benefits in a single case (although that is contradicted in this case[1] ), but it creates a national enforcement strategy completely hostile to any willing compliance with pollution control standards.
 
 
 48
 The most compelling argument in favor of EPA's interpretation, well expressed at pages 13-14 of the court's opinion, is that acceptance of National Southwire's argument means that a state would, in general, be able to override the requirement to apply NSPS to "modified" plants. This would be a serious matter, as the NSPS is a major part of Congress's plans to control and reduce pollution.
 
 
 49
 Fortunately, resolution of this case in accordance with Kentucky's desires, does not, in my opinion, create such a precedent. The purpose of the "modification" rule is to ensure that pollution control measures are undertaken when they can be most effective, at the time of new or modified construction. See 116 Cong.Rec. 32,918. (remarks of Sen. Cooper), reprinted in 1 Senate Committee on Public Works, A Legislative History of the Clean Air Act Amendments of 1970 (1974), at 260. Here there is no new construction, or any new modification, so there is no opportunity for effective placement of new control technology. Should there be a later decision that a higher level of pollution control is needed, the scrubbers can be turned on again. Thus, the true purposes of the modification rule are preserved in the action Kentucky and National Southwire seek.
 
 
 50
 There thus remains only the familiar question of what level of pollution control should there be, and at what cost. In many areas of environmental law, this question is explicitly or implicitly excluded from consideration. However, in the question of welfare-related standards, this is exactly the determination confided to the states, under EPA's supervision. It is exactly this judgment which the state has made and which EPA has approved. It is thus anomalous to have the effective implementation of one congressional policy thwarted by an interpretation of another policy that in this circumstance actually does nothing to advance that policy. In this particular type of circumstance, EPA's application of its general policy is unreasonable, and I would uphold Kentucky's action.
 
 
 51
 In addition, I believe that the plain intent of EPA's regulations at 40 C.F.R. Sec. 60.14(e)(5) would permit the change sought here. That section states that it is not a modification when there is the "use of any system ... whose primary function is the reduction of air pollutants, except when an emission control system ... is replaced by a system which the Administrator determines to be less environmentally beneficial." In our case National Southwire wants to replace its existing system which uses wet scrubbers and many other devices with a system to reduce air pollutants which includes all of the aspects of that system except for the wet scrubbers. This is exactly the replacement which took place between 1983 and 1986, with Kentucky's permission, and which resulted in no increase in concentration of fluoride.
 
 
 52
 If the Administrator were to make an affirmative determination that the new system is less environmentally beneficial (which might be difficult to do in the face of EPA's approval of Kentucky's reduced standards, Kentucky's approval of those standards, and the ambient air monitoring) then the Administrator might be able to avoid the operation of this section of EPA's own regulations. Otherwise, those regulations would exempt National Southwire from having to comply with prohibitively expensive new standards as the price of obtaining an accommodation that Kentucky is entitled to grant and desires to grant. However, in the absence of such a determination, I would hold that EPA's denial of the petition was unreasonable on this ground, as well.
 
 
 
 *
 Honorable George E. Woods, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Regulated pollutants under the Clean Air Act are either "health-related," based upon a link between exposure and human health problems, or "welfare-related," based upon a demonstrated relationship between exposure and damage to animals or vegetation. Certain "welfare-related" pollutants may be converted to a "health-related" risk based upon increasingly sophisticated testing methods or elapsed time documentation
 
 
 [2]
 The NSPS established by the EPA would impose a maximum rate of 1.9 pounds per ton of aluminum for both primary and secondary emissions from new and modified sources. See generally 40 C.F.R., Part 60, Subpart S, Sec. 60.192. Kentucky's original standard included, inter alia, a 1.0 pound gaseous fluoride per ton limitation for primary emissions and a 3.25 pounds per hour limitation for secondary emissions
 
 
 [3]
 An ambient air quality standard differs from an emission or performance standard, such as a NSPS. An ambient air quality standard specifies a maximum pollutant concentration in the ambient air, while a performance standard specifies the maximum rate at which an individual source may emit pollution. The EPA has set national ambient air quality standards for only six pollutants: lead, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and particulate matter. See 40 C.F.R. Part 50 (1986). Since ambient air quality standards have not been set for gaseous fluoride emissions, such measurements are not meaningfully transferrable to these emissions
 
 
 [4]
 The modification of an existing source renders it a "new source" as defined in 42 U.S.C. Sec. 7411(a)(2). All "new sources" are required to comply with the NSPS. See 42 U.S.C. Sec. 7411(e)
 
 
 [5]
 Since these regulations are nationally applicable, they may be challenged only by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit within 60 days of their promulgation. See section 307(b)(1) of the Clean Air Act, 42 U.S.C. Sec. 7607(b)(1); Motor Vehicle Manufacturers' Ass'n v. Costle, 647 F.2d 675, 677 n. 3 (6th Cir.1981)
 
 
 [6]
 The elements of NSA's system, minus the wet scrubbers, would be hoods, multicyclones, dry electrostatic precipitators (ESPs), and a smokestack. The hoods merely funnel emissions to the control devices; the multicyclones and ESPs remove fluoride particles but do not substantially affect gaseous fluoride emissions; and the smokestack simply disperses the emissions into the atmosphere but does not reduce them
 
 
 [7]
 NSA makes much of the fact that the EPA has proposed to approve Kentucky's relaxed section 111(d) standard, acknowledging the State's evidence that the relaxation would have "insignificant environmental impact." See 51 Fed.Reg. 43,395 (December 2, 1986). The EPA proposed approval of the relaxed standard because of the Agency's preliminary determination that the balance that the State had struck between economic and environmental impacts was within the latitude given the State under section 111(d). There is no such latitude, however, in determining whether a change in a plant constitutes a "modification" within the meaning of section 111(a)(4) which would trigger application of section 111(b)'s NSPS. The regulatory scheme calls for the consideration of costs and other factors in setting the level of the NSPS, see 42 U.S.C. Sec. 7411(a)(1)(C), but once that level is set, the standards apply uniformly to all new and modified sources. Therefore, the question of approval of a state's proposed relaxed standard under 111(d) is a wholly separate inquiry from the question whether such relaxation constitutes a "modification" for purposes of section 111(a)(4)
 
 
 [8]
 The EPA has established levels of emissions of various pollutants, including fluorides, that the agency considers de minimis for purposes of its program for the prevention of significant deterioration of air quality under Part C of the Clean Air Act. See 42 U.S.C. Secs. 7470-7479. The de minimis level for fluoride emissions was determined to be three (3) tons per year. 40 C.F.R. Sec. 52.21(b)(23)(i). The Agency found that fluoride emissions greater than three tons per year could cause damage to vegetation. See Fed.Reg. at 52,709. Thus, the proposed 1,174 tons per year increase from NSA's plant is nearly four hundred times the level that the EPA has found to be significant
 
 
 [1]
 Company monitoring, accepted by both Kentucky and EPA as far as it goes, indicates that turning off the scrubbers creates no increase in concentrations of fluoride in the atmosphere