**SIERRA CLUB, Plaintiff,**

v.

**PUBLIC SERVICE COMPANY OF COLORADO, INC., Salt River Project Agricultural Improvement and Power District, and Pacificorp, Defendants.**

No. 93–B–1749.

United States District Court, D. Colorado.

July 21, 1995.

Reed Zars, Laramie, WY, John Barth, Boulder, CO, for plaintiff.

Hubert A. Farbes, Jr., Brownstein Hyatt Farber & Strickland, P.C., Denver, CO, for defendants.

## AMENDED MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Pursuant to § 7604 of the Clean Air Act, 42 U.S.C. § 7401 et. seq., plaintiff Sierra Club brings a citizen suit for civil penalties and injunctive relief against defendants Public Service Company of Colorado (PSC), Salt River Project Agricultural Improvement and Power District (Salt River), and Pacificorp (collectively defendants). The defendants are owners/operators of Hayden Station which is a fossil fuel-fired steam generating facility located near Hayden, Colorado. Federal question jurisdiction also exists as this action addresses violations under the Colorado state implementation plan (SIP), the federally delegated air pollution program approved by the U.S. Environmental Protection Agency (EPA) pursuant to 42 U.S.C. § 7410. Sierra Club has complied with the notice of intent to sue provisions of 42 U.S.C. § 7604(b)(1)(A).

The Sierra Club moves for partial summary judgment of liability on each of the four claims asserted against the defendants. Claims one and two of the complaint allege that defendants violated the Clean Air Act in excess of 19,000 times in the past five years by emitting pollutants from the Hayden Station in excess of the 20% opacity limitation set forth in the Colorado regulations and in defendants' permit. In support of its motion Sierra Club relies on data and reports from Hayden Station's continuous emissions opacity monitors (CEMs) to establish emission violations. Claim four alleges that defendants willfully operated the Hayden Station for over two weeks in November and December of 1992 without a functioning electrostatic precipitator. Sierra Club alleges in claim four that this operation of Hayden Station when one-half of its electrostatic precipitator was dysfunctional caused excessive discharge of pollutants and constituted a "modification" of the Hayden Station without the requisite permit from the Colorado Department of Health (CDH). Based on the acts constituting claims one, two, and four, the Sierra Club alleges in claim three that defendants' consistent violation of the 20% opacity standard constitutes a failure to operate Hayden Station in a manner consistent with good air pollution control practices which violates Colorado Regulation 5. 5 C.C.R. 1001–8 Part A, and 40 C.F.R. § 60.11(d).

Defendants move for summary judgment on the first two claims. They contend that data and reports obtained from CEMs cannot be used to establish emissions violations under the SIP. Thus, in this summary judgment context, the pivotal issue is what, if any, evidentiary value may be attached to the CEM data and reports in a citizen suit under § 7604 of the CAA.

I.

The following facts are not genuinely disputed. Hayden Station is a fossil fuel-fired steam generating facility located near Hayden, Colorado. Hayden Station is currently owned by PSC, Salt River, and Pacificorp. Electricity is generated at the facility by burning coal to create steam. The steam passes through a turbine which in turn drives a generator to produce electricity. Hayden Station has two units, Units 1 and 2, which generate electricity in this manner.

PSC became the operator and partial owner of Hayden Station on April 15, 1992, having purchased its interest in the Hayden Station through Colorado Ute Electric Association, Inc.'s (Colorado Ute) bankruptcy proceeding. Before purchasing its interest in the Hayden Station, PSC's Environmental Manager, Mr. Pete Cohlmia, requested an audit of Colorado Ute's holdings. Plaintiff's Brief, Exh. B. Based on the audit, Cohlmia sent memorandums to PSC staff identifying problems with the Hayden Station air pollution control equipment. PSC also had an air pollution control feasibility study performed by United Engineers and Constructors for

Colorado Ute and Salt River. The study recommended the installation of baghouses at Hayden Station as the best method to reduce stack emissions and visible plume. Plaintiff's Brief, Exh. G.

Both units of the Hayden Station are subject to Colorado's air quality control regulations. The regulations provide that no owner or operator of either a new or existing source will permit emissions of any pollutant in excess of 20% opacity. 5 C.C.R. 1001–3, § I(A), II(A). Pursuant to the SIP, visible emissions are measured by CDH personnel using Method 9. 5 C.C.R. § 1001–3, § II.A.1., 40 C.F.R. Part 60, Appendix A, Method 9, p. 667. Method 9 is a visual observation of the plume or stack by a qualified observer. 40 C.F.R. Part 60, Appendix A, Method 9, p. 668. The observer must be certified by the CDH. Id. Certification is valid for six months. Id. at 669. When observing the plume, the observer stands at a distance sufficient to provide a clear view of the emissions with the sun oriented in the 140 degree sector to his back. Id. at 668. To the extent possible the observer should be perpendicular to the plume direction. Id. at 668. Based on these requirements, it is probable that the observer must ordinarily have access to the premises to conduct the Method 9 observation.

Pursuant to the Colorado regulations, Hayden Station is required to have a "continuous emission monitoring system for the measurement of opacity." 5 C.C.R. 1001–3, § VI.B.1. The system "shall be installed, calibrated, maintained and operated by the owner or operator of any steam generator of a total capacity of or greater than 250 million BTU. . . ." Id. The monitoring system "shall have such equipment installed in a location which in accord with sound engineering practice will provide for accurate opacity . . . emission readings." 5 C.C.R. 1001–3, § IV A. The owner or operator is required to calibrate the system at least once a day. Id. at § IV.F. Hayden Station has monitored the opacity of emissions from Units 1 and 2 by means of continuous emissions opacity monitors installed in each unit's exhaust stack since August of 1988. The CEMs analyze the opacity of emissions from each unit by passing a beam of light from one side of the stack across the exhaust path to a reflector which returns the light to the opacity sensor. The opacity sensor measures the attenuation of light from the stack's emissions. The opacity reading reflects the "degree to which emissions reduce the transmission of light and obscure the view of an object in the background." 40 C.F.R. § 60.2.

PSC submits quarterly reports to the CDH which document at six minute intervals the opacity readings from the CEMs. These reports include a computer listing of all CEM data, including a listing of each instance in which the CEM reflects that opacity emissions from either unit exceeded 20% opacity during the quarter and the operator's reasons for the excess emission. According to these reports, Hayden Station has exceeded the 20% opacity limit at least 19,727 times in the past five years. Complaint, Exhs. B–I.

Sierra Club's claim for failure to obtain a permit prior to modification is based on defendants' operation of Hayden Station for two weeks in November and December of 1992 without a fully functional electrostatic precipitator (ESP). At noon, November 25, 1992, defendants began the start-up of Unit 2 after it was out of service for 20 days for scheduled maintenance. Plaintiff's Brief, Exh. 5. Shortly thereafter, a short developed in the induced fan motor. The failure of the induced fan motor resulted in a failure of one-half of the ESP. Defendants operated Unit 2 for nineteen days without a fully functioning ESP. During this period, defendants filed at least four upset condition reports with the CDH:

November 30, 1992—Upset conditions for November 25th through the 27th. Plaintiff's Brief, Exh. 2, Attachment 2A.

December 4, 1992—Upset conditions for December 2nd through the 3rd. Plaintiff's Brief, Exh. 2, Attachment 2B.

December 7, 1992—Upset conditions for December 4th through December 5th. Plaintiff's Brief, Exh. 2, Attachment 2C.

December 14, 1992—Upset conditions for December 5th through the 13th. Plaintiff's Brief, Exh. 2, Attachment 2D.

An "upset condition" as defined at 5 C.C.R. 1001–2, § I.G, can excuse a violation of the emissions regulations if it meets the regulatory criteria of 5 C.C.R. 1001–2, § II.E. The upset condition reports were filed the day after the upset was complete. When the induced fan was repaired it was immediately replaced and the ESP was functional.

CDH has issued two notices of violation (NOV) to Hayden Station in the past five years. The first was issued February 13, 1989, for excess opacity emissions from Unit 2. Based on subsequent testing, CDH chose not to pursue any enforcement action. Hayden Station received a second NOV on September 27, 1993 for excess opacity emissions from Unit 2. Pursuant to a compliance order, PSC was assessed a civil penalty for $3,000.

Members of the Sierra Club reside in the Yampa Valley where the Hayden Station is situated. Standing is undisputed.

## II.

Summary judgment shall enter where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If a movant establishes entitlement to judgment as a matter of law given uncontroverted, operative facts contained in the documentary evidence, summary judgment will lie. *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992). The operative inquiry is whether, based on all the documents submitted, a reasonable trier of fact could find by a preponderance of evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Mares,* 971 F.2d at 494. Summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Mares,* 971 F.2d at 494.

If the moving party will not bear the burden of proof at trial, that party's motion for summary judgment need only demonstrate the absence of an element of the opponent's claim and the burden then shifts to the nonmoving party to present competent evidence to show the existence of a genuine issue of material fact for trial resolution. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). When, however, the issue is one on which the movant will bear the burden of proof at trial, summary judgment will lie only if the movant submits evidentiary material to establish the claim or defense. *Resolution Trust Corp. v. Northpark Joint Venture,* 958 F.2d 1313, 1322 (5th Cir.1992) *cert. den. sub. nom.,* —— U.S. ——, 113 S.Ct. 963, 122 L.Ed.2d 120 (1993).

## III.

### A.

■ The Sierra Club's first and second claims allege that defendants have violated and are in violation of Colorado's emission control regulations which make it unlawful for any owner or operator of a stationary source to allow or cause the emission into the atmosphere of any pollutant in excess of 20% opacity. 5 C.C.R. 1001–3, § I.A. To meet its summary judgment burden, Sierra Club relies primarily on defendants' CEM data and reports as evidence of defendants' continuous violation of the 20% opacity limitation. Defendants argue that violations of the opacity standard can only be established through a Method 9 observation as provided for in the Colorado SIP. Because the Sierra Club proffers no evidence of unredressed violations determined by Method 9, defendants contend that summary judgment should enter in their favor on Sierra Club's first two claims.

The issue, then, is whether in this citizen's enforcement action the CEM data and reports constitute evidence of emissions violations. If they do then no reasonable trier of fact could fail to conclude that Sierra Club has proved claims one and two of it's complaint. I conclude in light of the applicable statutory and regulatory scheme viewed in common sense fashion that the CEM data and reports constitute competent evidence of ongoing emissions violations.

The Colorado emissions regulations provide that smoke and opacity emissions for stationary sources shall be measured by EPA Method 9. 5 C.C.R. 1001–3, § II.A(1). In support of their contention that Method 9 is the only method that can be used to establish a violation of the opacity standard, defendants cite to an EPA guidance document (the CEM GD) issued April 22, 1986. The CEM GD states that the "legal requirement [for measuring emissions] must specify CEMS as the Compliance Method in order for *EPA* to rely on CEMS data alone *to refer a case to the Department of Justice (DOJ), to prove a violation of an emission limitation in Federal district court, or to issue a Notice of Noncompliance ("NON") under § 120.*" Defendants' Summary Judgment Brief, Exh. L, p. 2. (emphasis supplied). Defendants argue that because the legal requirement in the Colorado SIP is Method 9, only Method 9 observations can be used to establish liability for emissions violations. I disagree.

The purpose of the Clean Air Act, as expressed by Congress, is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401. Recognizing the importance of attaining the remedial goal of the Clean Air Act and the magnitude of the task at hand, Congress armed citizens with an independent means to require compliance with the Act. 42 U.S.C. § 7604. If a state has an approved SIP, primary enforcement power lies with the implementing state agency. 42 U.S.C. § 7414(b). The EPA oversees the state agencies. 42 U.S.C. § 7414(b)(2). If the state agency or the EPA fails for any reason to carry out its duties under the Act, citizens may bring suit directly against the alleged violator. 42 U.S.C. § 7604. Debate surrounding amendments to the Clean Air Act evidences that citizen suits are an intricate part of the Act's enforcement scheme. *See Congressional Record, Wednesday March 21, 1990, Clean Air Act Amendments, 136 Cong.Rec. S2826–01; Congressional Record, Thursday September 12, 1985, Pollution Laws preserved Rights, 131 Cong. Rec. S11305–02.* The citizen enforcement provisions of the Act reflect congressional recognition that neither the federal nor state governments have the resources to ensure that generators of air pollutants are consistently in compliance with the Act. Therefore, to supplement governmental enforcement of the Clean Air Act citizen suits provide interstitial means for enforcement of environmental standards in furtherance of the remedial purpose of the Act.

To aid citizen enforcement, access to information necessary to prove that an entity is violating the Act is provided by § 7414 of the Act. That section states that any records, reports or information required to be filed under the Act must be made available to the public unless the information involves trade secrets. 42 U.S.C. § 7414(c). Under the Colorado SIP, owners or operators of fossil fuel generators are required to install, calibrate, maintain, and operate CEMs. 5 C.C.R. 1001–3, § IV.G. These owners and operators must submit quarterly reports listing excess emissions for all pollutants monitored for that quarter. Id. Pursuant to § 7414, this information must be made available to the public.

The CEM maintenance and reporting requirements alone impart a high degree of probative reliability to the CEM data and reports. *See Garner v. United States,* 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976); *United States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). Moreover, since the Clean Air Act establishes a regime of strict liability, *United States v. Harford Sands, Inc.,* 575 F.Supp. 733, 735 (D.Md.1983), CEM data and reports may provide conclusive evidence of emissions *compliance. Friends of the Earth v. Potomac Electric Power Co.,* 419 F.Supp. 528, 533 (D.D.C.1976). It follows that if such records are probative of compliance with the Act they are probative of the Act's violation.

Indeed, PSC does not genuinely dispute the relative reliability of CEM data over Method 9 data having stated in an earlier compliance proceeding involving another plant that:

Given the known limitations upon the accuracy of Method 9, petitioner [PSC] requests that the COMs [CEMs] data be considered conclusive evidence and, ac-

cordingly, the alleged violation for Unit No. 2 be dismissed.

Plaintiff's Brief, Exh. S. *See also*, 40 C.F.R. § 60.11(e).

Defendants read the regulations restrictively to mean that violations of the Clean Air Act can be proven *only* by Method 9. However, in its amicus brief CDH states that its exclusive reliance on Method 9 to show emissions violations stems from ambiguity of applicable language, not unreliability of CEM data and reports. CDH supports use of such data and reports to determine opacity violations and does not oppose my saying so. Defendants' restrictive construction of the regulatory scheme guts the interstitial remedial functions of the Act's citizen suit provisions contrary to the overriding purpose of the Clean Air Act.

Furthermore, a Method 9 observation must be made by an individual certified by the state. 40 C.F.R. Part 60, Appendix A, Method 9, p. 667, 668. To conduct the observation properly, it is probable that the observer have access to the premises. Id. State and federal officials have a right to enter the premises to perform these observations. 42 U.S.C. § 7414(a)(2). Citizens do not. Thus, the only way a citizen group can obtain a Method 9 reading is to hire a certified observer who would then either enter the premises illegally or request permission from the alleged violator to enter the premises. As to the former, I cannot find that any act of Congress would encourage or foster illegal activity. The adage "forewarned is forearmed" applies to the latter.

An entity which has notice when an observation is to occur will be motivated to meet the compliance standard at that time. But continuous compliance, not contrived compliance is the goal here. In this regard the United States General Accounting Office in its Report to the Chairman, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, House of Representatives, stated "it is fair to assume that compliance data being reported by States do not indicate what is happening at a facility on a day-to-day basis, but rather whether the source has been determined to be in compliance at an announced inspection after it has had the opportunity to optimize the performance of its control equipment. Thus, it indicates whether the source is capable of being in compliance rather than whether it is in compliance in its day-to-day operations." Plaintiff's Brief, Exh. U, p. 21.

Further support for this reasoning is found in § 7414(b)(2). Pursuant to § 7414(b)(2) the EPA can conduct inspections and monitor facilities independent of the state agency. 42 U.S.C. § 7414(b)(2). The EPA is required to give reasonable notice to the state agency of the inspection and the purpose of the inspection unless the EPA has reason to believe that the state agency will inform the person whose property is to be affected. 42 U.S.C. § 7414(d)(1). Thus, Congress recognized that the purposes of the Act could only be fulfilled where the entity investigated was not forewarned of the inspection.

I am concerned that the owner or operator of the stationary source has no duty to permit the representative of the citizen group onto its premises. If I accept defendants' argument that only Method 9 observations may be used to prove violations of the Clean Air Act, it follows that the alleged violator is afforded a large measure of control over enforcement of the Act by citizens groups. The alleged violator can either deny access to the citizen group or it can permit the Method 9 inspection at a time when it can meet the emission standard. Such a result would be contrary to the Act's purpose and undermine congressional intent.

Section 7604(a)(1)(A) provides that "any person may commence a civil action on his own behalf—against any person ... who is alleged to have violated (if there is evidence that the violation has been repeated) or to be in violation of (A) an emission standard or limitation." Emission standard or limitation includes "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard * * * which is in effect under this chapter ... or under an applicable implementation plan." 42 U.S.C. § 7604(f)(1). Here, the Sierra Club seeks to enforce a National Ambient Air Quality Standard (NAAQS) promulgated pursuant to § 7409, 42 U.S.C. § 7409, and adopted in the Colorado SIP pursuant to § 7410. 42 U.S.C.

§ 7410. The Sierra Club is, thus, simultaneously enforcing an emission standard "under this chapter" and an emission standard "applicable under an implementation plan." Defendants argue that a citizen group should be bound by the method of enforcement contained in the SIP. However, nothing in the Act, its implementing regulations, or the Colorado SIP bind citizens to a particular method of proving violations.

Defendants argue at length that use of CEM data and reports as evidence of opacity violations constitutes judicial amendment of the applicable emissions standard. This is not so. The 20% opacity standard is still the 20% opacity standard. Rather, the focus of my analysis under the applicable statutory and regulatory scheme here is evidentiary.

I hold that in this citizen action under the Clean Air Act violations of the 20% opacity standard may be established by CEM records and reports as that data carries with it high indicia of reliability and probative value.

This holding is bolstered by the 1990 amendments to the Clean Air Act which added a new § 113(e), 42 U.S.C. § 7413. That section provides that in "determining the amount of any penalty to be assessed under ... section 7604(a) of this title ... the court, as appropriate ... shall take into consideration ... the duration of the violation as established by any credible evidence (including evidence other than the applicable test method)."

> The amendment clarifies that courts may consider any evidence of violation or compliance admissible under the Federal Rules of Evidence, and that they are not limited to consideration of evidence that is based solely on the applicable test method in the State implementation or regulation. For example, courts may consider evidence from continuous emission monitoring systems, expert testimony, and bypassing and control equipment malfunctions, even if these are not the applicable test methods. Thus, the amendment overrules the ruling in *United States v. Kaiser Steel Corp.*, No. 82–2623–IH [1984 WL 186690] (C.D.Cal. January 17, 1984) to the extent that the court in that case excluded the consideration of such evidence.

Senate Report No. 101–228, December 20, 1989, p. 366, 1990 U.S.Code Cong.Admin.News, 101st Congress—Second Session, p. 3749.

I conclude that defendants' CEM data and reports provide undisputed evidence of their continuous violation of the 20% opacity limit at the Hayden Station. Accordingly, I will grant partial summary judgment in favor of Sierra Club on their first two claims for relief and deny defendants' motion as to these claims. Appropriate remedy will be determined in further proceedings.

### B.

▉ The Sierra Club alleges that an unapproved modification of the Hayden Station occurred on November 25, 1992 when defendants continued to operate Unit 2 after one-half of the ESP failed. "Modification" is defined as "any physical change in, or change in the method of operation of, a stationary source which increases the emission rate of any pollutant for which a Federal or state emission standard has been promulgated or which results in the emission of any such pollutant previously not emitted." 5 C.C.R. 1001–2, p. 19. A physical change does not include "routine maintenance, repair, and replacement." Id.

It is undisputed that when the ESP failed, defendants immediately removed it and sent it for repair. It took approximately nineteen days to complete the repair. Once the ESP was returned and installed, Unit 2 was operating in the same manner as it had before the failure. The removal, repair and replacement of the ESP, therefore, did not constitute a "physical change" as defined by the Act nor did it constitute a change in the method of operation. *See National–Southwire Aluminum Co. v. United States Environmental Protection Agency*, 838 F.2d 835, 838–839 (6th Cir.1988). *See also, Letter of General Counsel, E.P.A., January 30, 1990*, 1990 WL 357113 (E.P.A.G.C.). I conclude, therefore, that defendants' operation of Hayden Station while the ESP was dysfunctional was not, as a matter of law, a modification. Accordingly, the Sierra Club's motion for summary judgment on claim three is denied.

Defendants contend that the failure of the ESP constitutes an upset. An "upset" is "[a]n unpredictable failure of air pollution control or process equipment which results in the violation of emission control regulations and which is not due to poor maintenance, improper or careless operations, or is otherwise preventable through the exercise of reasonable care." *Id.* at p. 33. Emission excedences resulting from upsets are excused if the CDH is notified no later than two hours after the start of the next working day followed by written notice explaining what caused the violation. 5 C.C.R. 1001–2. The ESP is part of the air pollution control equipment at Hayden Station. The Sierra Club proffers no evidence establishing that the failure of the ESP was due to poor maintenance, poor operating conditions, or was preventable by some other means. Conflicting evidence is presented regarding the number of upset reports made by defendants, whether the reports were timely made, and whether they were followed by written notification. However, as a matter of law, defendants are liable for excess emissions occurring as a result of the ESP failure because the upset defense was not asserted to claims one and two. And, in any event, this defense has in no way been asserted as to the continuous and ongoing opacity limit violations established by Sierra Club outside the two week period of the alleged upset.

### C.

■ The Sierra Club's final claim alleges that defendants have not operated Hayden Station in a manner consistent with good air pollution control practices for minimizing emissions as required by 40 C.F.R. § 60.11(d). "Determination of whether acceptable operating and maintenance procedures are being used will be based on information available to the Administrator which may include, but is not limited to, monitoring results, opacity observations, review of operating and maintenance procedures, and inspection of the source." Id.

Defendants contend that there are disputed factual issues regarding their decision not to install new pollution control technology at Hayden Station which prevents the entry of summary judgment. The why of it may be in question but the need for and feasibility of the new technology is not genuinely disputed. Any dispute of fact surrounding this decision does not diminish the probative value of the CEM data and reports over which there is no genuine dispute. The CEM data proves that defendants have continuously violated the opacity limitation from 1988 to the date of this lawsuit. This evidence is corroborated by PSC's own internal memorandums concerning the need for improved technology at the Hayden Station. Sierra Club's evidence shows conclusively that defendants have failed to operate Hayden Station in a manner consistent with good air pollution control practices for minimizing emissions. Accordingly, I grant the Sierra Club's motion for summary judgment on its third claim. As with Sierra Club's first and second claims, remedy on the third claim will be determined in further proceedings.

It is therefore ORDERED that:

Partial summary judgment of liability shall enter in favor of plaintiff against defendants on plaintiff's first claim for relief alleging that defendants emitted pollutants in violation of Colorado air pollution regulations, second claim for relief alleging defendants emitted pollutants in violation of permit limitations, and third claim for relief alleging that defendants have failed to operate Hayden Station consistent with good air pollution control practices.

It is further ORDERED that plaintiff's motion for partial summary judgment on its fourth claim alleging that defendants failed to obtain a permit prior to operating Hayden Station without a functioning electrostatic precipitator, which plaintiff claims is a modification, is DENIED.

It is further ORDERED that defendants' motion for summary judgment on plaintiff's first and second claims for relief is DENIED.