**UNIVERSITY OF KENTUCKY, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

Civ. A. No. 92–521.

United States District Court,
E.D. Kentucky,
Lexington.

Jan. 13, 1994.

Steven L. Beshear, Ashley W. Ward, Stites & Harbison, Lexington, KY, and Carel T. Hedlund, Ober, Kaler, Grimes & Shriver, Baltimore, MD, for plaintiff.

Dell M. Littrell, U.S. Attorney's Office, Lexington, KY, and Lana Smith Sensenig, U.S. Dept. of Health & Human Services, Atlanta, GA, for defendant.

## MEMORANDUM OPINION

FORESTER, District Judge.

### I.  INTRODUCTION

Plaintiff University of Kentucky brings this action pursuant to Section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, to obtain judicial review of the final decision by the Defendant Secretary of Health and Human Services ("Secretary") concerning Medicare reimbursement under Part A to the Plaintiff's University Hospital for fiscal year ending ("FYE") June 30, 1987. As a result of the Secretary's decision, the University Hospital's Medicare reimbursement was reduced in the amount of approximately $249,000.00. In determining the Plaintiff's Medicare reimbursement under Part A, the Secretary concluded that the time spent by its interns and residents in the clinics in the Medical Plaza building should not be counted in calculating the Part A reimbursement because the clinics in the Medical Plaza building were "freestanding" and not part of the University Hospital.

In bringing this action, Plaintiff contends that the Secretary's decision is arbitrary and capricious and that it is not supported by substantial evidence when the record is viewed as a whole. 42 U.S.C. § 1395oo(f)(1), incorporating 5 U.S.C. § 706(2).

This matter is before the Court on cross-motions for summary judgment. The Court having heard oral argument on these motions and these motions having been fully briefed, they are ripe for consideration.

### II.  FACTUAL BACKGROUND

#### A.  History of the Medicare program

In 1965, the Medicare program administered by the Defendant was established to provide health insurance for the elderly and the disabled. Social Security Amendments of 1965, Pub.L. No. 89–97, § 102(a). The Medicare program is divided into two parts: Part A and Part B. Part A, known as the "health insurance program," provides insurance for inpatient hospital and related post-hospital services, 42 U.S.C. §§ 1395c, 1395d. Part B establishes a voluntary program of "supplementary medical insurance" covering physicians' charges and other medical services. 42 U.S.C. §§ 1395k, 1395l and 1395x(s).

Plaintiff herein is contesting the amount of its reimbursement under Part A of the Medicare program (hereinafter referred to as "hospital reimbursement"). The medical services rendered in the physician clinics involved in this case are payable to the physicians or clinics under Part B of the Medicare program (hereinafter referred to as "physician reimbursement").

#### 1.  Hospital Reimbursement

Prior to 1983, a hospital received Medicare reimbursement under Part A for both inpatient and outpatient medical services based primarily on the "reasonable cost" of covered

services. 42 U.S.C. § 1395f(b). The Medicare program defined "reasonable cost" to mean "the cost actually incurred" exclusive of incurred costs "found to be unnecessary in the efficient delivery of needed health services." *Id.* § 1395x(v). Consequently, when a hospital's costs of providing covered services increased, its reimbursement under Part A likewise increased, resulting in (1) the burden of cost increases being shifted from the hospitals to the federal government, and (2) little or no incentive for hospitals to provide covered services economically and efficiently. For this and other reasons, the cost of reimbursement under Part A experienced significant increases in the 1970s and early 1980s.

To curtail the rapidly rising cost of Part A reimbursement, in 1983 Congress enacted the Prospective Payment system ("PPS"), which substantially altered the method of payment for inpatient operating costs reimbursable under Part A.[1] Section 1886(d) of the Social Security Act. 42 U.S.C. § 1395ww(d). Under the PPS, acute care hospitals, such as the Plaintiff's, are reimbursed on the basis of prospectively determined federal rates, instead of actual operating costs, for inpatient services. 42 U.S.C. § 1395ww(d)(1), (d)(4); *see* 42 C.F.R. § 412.-60. After implementation of the PPS, patients were divided into "diagnosis-related groups" ("DRGs"), and Medicare payments for inpatient operating costs are now based primarily on a nationally uniform federal rate, comprised of both national and regional reimbursement rates, for each DRG. *Id.* § 1395ww(d)(2), (d)(3); *see* 42 C.F.R. §§ 412.62, 412.63.

With the enactment of the PPS program, Congress also adopted several provisions designed to accommodate the needs of teaching hospitals that have interns and residents (hereinafter "residents") on their premises, such as Plaintiff's University Hospital. One of the provisions relevant to this case that Congress enacted for the benefit of teaching hospitals is the indirect medical education ("IME") adjustment that was designed to compensate teaching hospitals for the "indirect costs" of medical education. 42 U.S.C. § 1395ww(d)(5)(B). Teaching hospitals have greater indirect inpatient costs than do non-teaching hospitals. These increased inpatient costs are a function of (1) the greater number of tests and procedures ordered by residents, as a part of the teaching process, than would ordinarily be ordered by more experienced physicians, and/or (2) the costs associated with patients requiring more extensive care than in non-teaching facilities. (A.R. 258–261, 477–78, 483).[2]

A teaching hospital's indirect inpatient costs of medical education are not separately identifiable on its cost report; instead, they are reflected in overall increased operating costs. Therefore, to compensate the teaching hospital for these increased but not separately identifiable operating costs, the Medicare program statistically estimates these costs as a function of teaching intensity that is expressed as a ratio of the number of full-time equivalent (hereinafter "FTE") residents to the number of available beds in the hospital. 51 Fed.Reg. 16775 (A.R. 486).

As originally enacted in 1983, the regulation concerning the IME adjustment only allowed residents in the inpatient departments of a hospital to be counted in determining the FTE equivalent. 42 C.F.R. § 412.118(g) (1985). However, in 1986, the PPS statute was amended to allow teaching hospitals to count the time spent by residents in both the inpatient and outpatient departments of hospitals in calculating the FTE equivalent, which is a factor in determining the IME adjustment. Consolidated Omnibus Reconciliation Act of 1985 ("COBRA"), Pub. Law 99–272, Section 9104 (hereinafter the "COBRA Amendment"). Thereafter, the Secretary modified the regulations to conform to the COBRA Amendment by promulgating the following regulation:

> Interns and residents who are assigned to a setting other than the inpatient or outpa-

---

1. PPS does not apply to the outpatient costs incurred by hospitals, which continue to be reimbursed on a reasonable cost basis. However, as discussed *infra*, certain other limitations have been imposed on outpatient costs.

2. The designation "A.R." refers to the two-volume Administrative Record filed by the Secretary that is a compilation of the proceedings below in this case.

tient department of the hospital (such as a freestanding family practice center or an excluded distinct part hospital unit) on the day that the count of interns and residents ... is made are not counted as full-time equivalents. Only the percentage of time that the interns and residents spend in the portion of the hospital subject to the prospective payment system or in the outpatient department of the hospital on the day the count is made is used to determine the indirect medical education adjustment.

42 C.F.R. § 412.118(g)(1) (1986) (recodified as § 412.105(f)(5) (1991)). Subsequently, Congress followed suit by requiring the Secretary to "continue to count interns and residents assigned to outpatient services of the hospital as part of the calculation of the full-time equivalent number of interns and residents" for the IME adjustment. Pub.L. No. 99–272, § 9104(a), *amending* 42 U.S.C. § 1395ww(d)(5)(B)(iv) (A.R. 700).

### 2. *Physician Reimbursement*

Historically, the Medicare program reimbursed physicians on the basis of the lowest of their usual, customary and prevailing charges for similar services. 42 U.S.C. § 1395u(b)(3). Under this payment plan, separate charges were established for each procedure (such as extended office visits, x-rays, and other tests) based on the actual charges by physicians in private practice.

In the private practice setting, no problems were encountered in distinguishing Medicare payments under Part A and Part B. The hospital received payment for its costs under Part A, and the physician who practiced in his own private office independent of the hospital received payment under Part B based on the "reasonable charges" for the services rendered.[3] Since the "reasonable charges" were developed for physicians in private practice, the Part B payment was presumably sufficient to compensate the physician for (1) the professional services rendered, (2) all of the physician's overhead costs of running his office, and (3) a profit factor.

However, the distinctions in payment between Medicare payments under Part A and Part B for the hospital-based physician have not been as clear-cut as for the physician in private practice and have been the source of continuing controversy. Prior to 1982, the "reasonable charge" levels did not vary depending on where the services were provided, and hospital-based physicians received the same amount of payment as physicians in private practice regardless of the fact that the services were performed in the hospital department where the overhead costs were borne by the hospital. Furthermore, when physician services were provided in hospitals, little direction existed as to which services should be reimbursed to the hospitals on a reasonable cost basis under Part A and which services should be reimbursed to physicians on a reasonable charge basis under Part B. These problems arose most frequently with physicians who had a special affiliation with a hospital, such as the faculty physicians in a teaching hospital.

### 3. *Reimbursement of Hospital–Affiliated Clinics*

Prior to 1982, there were alternative means by which hospital-affiliated clinics, such as the clinics in the present action, could be reimbursed under the Medicare program. One method would be for the hospital to "lease" a department to physicians who would then submit a bill to Medicare for Part B reimbursement. In this "lease" situation, it was not unusual for the hospital to retain the rights to receive a portion of the billings and to control the physicians' practice. This arrangement was apparently quite common because it was perceived that Medicare reimbursement would be greater under Part B, which included a profit factor, than under Part A, which was limited to costs. Under this type of arrangement, the hospital was effectively allowed through its salaried physicians to bill for reasonable charges and to avoid the distinctions between Part A and Part B that had been established by the

**3.** As of January 1, 1992, physicians were no longer paid on the basis of reasonable charges and are now paid based on a Relative Value Scale. *See* 42 U.S.C. § 1395w–4. However, since this action concerns the FYE June 30, 1987, all references herein to Part B payments refer to the reasonable charge system in effect prior to January 1, 1992.

Medicare Act. 48 Fed.Reg. 8911–12 (March 2, 1983).

Another method for billing in a hospital-affiliated clinic was to reimburse the hospital under Part A for all of its operating costs, such as space, nurses, technicians and other personnel, actually incurred. Employing this method, prior to 1982, the physicians could then bill Medicare under Part B for the professional services rendered to the hospital patients. However, since the Part B "reasonable charge" structure was developed with reference to private physicians who incurred overhead costs for running their offices, the Part B payments to hospital-based physicians who had no overhead costs to bear were excessive and were in part duplicative of the reimbursement for overhead costs paid to the hospital under Part A.

In 1982, Congress rectified these gray areas in the Medicare program that resulted in the duplicative payment of overhead costs in the form of payments to a hospital under Part A and payments to hospital-based physicians under Part B. Congress addressed this problem by enacting the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub.L. No. 97–248. *See* TEFRA § 101, 96 Stat. 324, 332–34, codified as Section 1886(b) of the Social Security Act. In Section 108 of TEFRA, Congress directed the Secretary to establish criteria through regulations for distinguishing those medical services (including inpatient and outpatient) which may be reimbursed as physician services under Part B on a reasonable charge basis from those services which may be reimbursed only to the hospital under Part A on a reasonable cost basis. 42 U.S.C. § 1395xx(a). In enacting this statute, Congress noted that the distinction between services reimbursable under Part A and those reimbursable under Part B had never been uniformly implemented, especially with respect to "hospital-based" physicians who perform teaching, supervisory and research functions in connection with their direct medical care services. Senate Rpt. No. 97–494, 97th Cong., 2d Sess., 21–22, *reprinted in* 1982 USSCAN 781, 797–98.

In Section 104 of TEFRA, Congress specifically recognized the problem presented by the hospital-based physician who bore no overhead costs and the inherent unfairness in paying the same amount for services rendered in a private physician's office or a freestanding clinic and for these same services rendered in the outpatient department of the hospital. TEFRA, § 104. In both cases, the reimbursement to the physician was intended to cover the overhead costs of rendering the professional services; however, in the case of services rendered in outpatient department of a hospital, the overhead costs had already been reimbursed to the hospital under Part A of the Medicare program. Therefore, the Part B reimbursement to the hospital-based physician was in part duplicative of the Part A reimbursement to the hospital. Consequently, Congress directed the Secretary to eliminate this inequity by formulating regulations placing limitations on the reasonable charges for physicians' services rendered in a hospital outpatient setting after taking into account the extent to which overhead costs associated with such outpatient services have already been included in the reasonable cost or charge of the hospital. 42 U.S.C. § 1395u(b)(3)(F).

Pursuant to these Congressional directives, the Secretary promulgated regulations prohibiting hospitals from "leasing" their outpatient departments to physicians who assumed all operating costs and billed Medicare for all services rendered in the outpatient departments under Part B rather than Part A, 42 C.F.R. § 405.550(e), and reducing payment to 60% of the reasonable charge for physician services rendered in hospital outpatient settings, 42 C.F.R. 405.-502(f)(1).[4] The intent of the former regulation, 42 C.F.R. 405.550(e), was to prevent hospitals from converting Part A services to Part B services by leasing out part of the hospital, including outpatient departments, to physicians. The latter regulation limits the reimbursable charges of physicians in outpatient departments; however, this regulation is not applicable to freestanding clinics.

**4.** These two regulations were issued simultaneously on October 1, 1982; however, 42 C.F.R. § 405.550(e) was not effective until October 1, 1983. 47 Fed.Reg. 43578, 43610 (10/1/82); 48 Fed.Reg. 24308 (5/31/83).

## B. *Undisputed facts*

As seen from the administrative proceedings below, Plaintiff's University Hospital ("Hospital") is a general short-term hospital that is operated as a component of the Albert B. Chandler Medical Center, which is a division of the University of Kentucky. The Hospital is the only patient care setting in the Medical Center. The Plaintiff also operates a medical school, and the Hospital is the primary teaching hospital for the medical school. (A.R. 29). The medical staff of the Hospital is comprised of the physician faculty members of the Plaintiff's College of Medicine, who see their patients in both the inpatient and outpatient settings. (A.R. 185–186).

The outpatient clinics ("Clinics") at issue herein were physically located in the ambulant wing of the Hospital building until 1983, when the Medical Plaza building opened across the street from the Hospital. (A.R. 192). Due to space limitations in the main Hospital building, most of these Clinics moved into this new building that is connected to the Hospital by an overhead walkway. (A.R. 249, 250–251). Both the Hospital and the Clinics are owned by the Plaintiff. (A.R. 29).

As part of the education the Plaintiff's College of Medicine provides to its medical students, the Hospital operates approved residency training programs. In order to provide ambulatory care experience to the medical residents, the Hospital utilizes its Clinics in its approved residency programs. (A.R. 190). In the Clinics, the residents are supervised by the faculty physicians in the College of Medicine—the same faculty physicians who supervise their training in the inpatient setting and who are the medical staff of the Hospital. (A.R. 186).

The Kentucky Medical Services Foundation ("KMSF") is a non-profit corporation established to administer the practice of the Clinics' physicians. KMSF provides a billing and collection service for these physicians. The board of directors of KMSF is comprised of the physicians participating in the practice plan. (A.R. 30).

In 1983, the Clinics' physicians recognized that when Section 104 of TEFRA became effective, their Medicare reimbursement under Part B would be decreased to 60%, pursuant to the limitations imposed on hospital-based physicians, unless they could qualify for an exemption from this TEFRA amendment. Consequently, in 1983, the Clinics' physicians, acting through KMSF, requested an exemption from the TEFRA limitation. This request was denied because the Hospital was paying a portion of the overhead costs of the Clinics' physicians and including these overhead costs in its Medicare cost report for Part A reimbursement. (A.R. 592). However, in September 1985, the KMSF renewed its request for an exemption from the TEFRA limitation for the following reason:

> The reason for requesting an exemption at this time is that the University Hospital has announced that it will discontinue charging a $6.00 fee for each outpatient visit if KMSF will pay for the drugs and supplies. This change will result in the University Hospital not having any income or expense of any kind for clinic services in their cost reports. This change will be implemented to correspond with your ruling.

A.R. 592. In response to this renewed request for an exemption from the TEFRA limitation, the Health Care Financing Administration ("HCFA")[5] sent KMSF a questionnaire to be completed, explaining that the responses to those questions would form the basis for HCFA's decision on KMSF's renewed request for exemption from the TEFRA limitation and that the state survey agency would be contacted to verify these responses. (A.R. 593). The purpose of this questionnaire was to obtain information concerning the relationship between the Clinics and the Hospital. The responses to this questionnaire indicated that while the Clinics still had close ties to the Hospital, several factors mentioned by KMSF also indicated that the Clinics qualified as freestanding for purposes of the regulations implementing

---

**5.** HCFA is the operating component of the Department of Health and Human Services that is responsible for the administration of the Medicare program.

Sections 104 and 108 of TEFRA. For example, the information KMSF submitted included statements that the Clinics and the Hospital are not operated under common management and are, for the most part, located in separate buildings attached by an overhead walkway. KMSF also indicated that ongoing attempts were being made to identify the Clinics as being separate from the Hospital. The questionnaire responses also indicated that the Clinics' medical records are separate from the Hospital's inpatient records and that the Clinics have billed as physician-directed clinics since 1979. (A.R. 592–598).

Subsequently, HCFA reviewed the information obtained from KMSF in responding to its questionnaire, and on October 22, 1985, HCFA granted KMSF's request for exemption from Section 104 of the TEFRA limitation, stating as follows:

> We have completed our review of the information you furnished this office on October 2, 1985. That information was submitted in support of your request for exemption from the provisions of Section 104 of the Tax Equite [sic] and Fiscal Responsibility Act of 1982.
>
> Based on our review of the above information we have concluded that the Kentucky Medical Services Foundation, Inc. (KMSF) meets the criteria of free-standing, i.e., an independent clinic not to be considered for Medicare reimbursement purposes as a part of the University Hospital. The effective date of this transaction is October 8, 1985.

(A.R. 723).

As a result of HCFA's determination that KMSF should be exempted from Section 104 of TEFRA because the Clinics should be classified as "freestanding" for purposes of Medicare reimbursement, the Clinics' physicians have received a very substantial increase in payments under Part B since January 1, 1986.[6] However, HCFA's determination that the Clinics were "freestanding" as of October 8, 1985, has also resulted in the corollary effect of a slight reduction in the Hospital's IME payment under Part A. For example, in the FYE June 30, 1987, Blue Cross and Blue Shield of Kentucky, Inc., which acts as the Hospital's fiscal intermediary in Kentucky pursuant to a contract with the Secretary, 42 U.S.C. § 1395h, determined that the Hospital could not count the time that residents spent in the Clinics because the Clinics had previously been determined by HCFA to be freestanding, and reduced the Hospital's IME reimbursement by approximately $250,000, which is slightly more than one percent (1%) of the Hospital's total Medicare reimbursement (approximately $22,000,000) for FYE June 30, 1987. (A.R. 793).

## C. *The Administrative Proceedings Below*

On September 27, 1989, the Hospital's Intermediary, Blue Cross and Blue Shield of Kentucky, Inc., notified the Hospital that it had reviewed the Hospital's Statement of Reimbursable Costs submitted for FYE June 30, 1987, and that it had made certain adjustments thereto. The Intermediary also advised the Hospital of the procedures to follow if the Hospital wanted to challenge the Intermediary's adjustments to the Hospital's Medicare cost report. (A.R. 790–792). Subsequently, on March 19, 1990, the Hospital requested a hearing before the Provider Reimbursement Review Board ("PRRB") to contest the Intermediary's adjustments to its Medicare cost report. (A.R. 789).

On January 8, 1992, the PRRB conducted a hearing on the Hospital's challenge to the Intermediary's adjustments to its Statement of Reimbursable Costs for FYE June 30, 1987. The PRRB framed the issue before it as follows:

> Whether the Intermediary's calculation of the number of full-time equivalent interns and residents for purposes of the indirect medical education adjustment for FY 1987 was correct, in that it excluded time spent by interns and residents in certain outpatient clinics.

(A.R. 29). On August 27, 1992, in a 3–1 decision, the PRRB reversed the Intermedi-

---

**6.** A portion of the Part B Medicare reimbursement to the Clinics is given back to the University of Kentucky. (A.R. 131, 142, 145–156).

ary's calculation of the Hospital's IME adjustment, explaining, in part, as follows:

Based on the evidence in the record, the majority of the Board concludes that the clinics in the Medical Plaza building are a part of the Provider. The clinics are included in the Provider's licensure, JCAH accreditation, and Medicare certification. The majority notes that in 1983 HCFA made a determination that those clinics were a part of the Hospital outpatient department. (Provider Exhibit 43). Between 1983 and 1986, there were no changes in the structure, management, licensure, or accreditation of the Clinics. In addition, the majority notes there is a single patient registration system which is used for both inpatient and outpatient settings.

(A.R. 35).

Subsequently, both the Intermediary and the Secretary's Bureau of Policy Development timely requested HCFA's Administrator to review and to reverse the decision of the PRRB in reversing the Intermediary's adjustments to the Hospital's IME reimbursement. In a decision rendered on August 27, 1992, HCFA's Administrator reversed the decision of the PRRB and determined that the Intermediary had properly excluded the time spent by residents and interns in the Clinics in calculating the Hospital's IME adjustment. (A.R. 2–11). The decision by HCFA's Administrator was the final decision of the Secretary.

In arriving at his decision, HCFA'a Administrator reviewed the entire record furnished by PRRB, "including all correspondence, position papers and exhibits." (A.R. 4). The Administrator also reviewed and PRRB's decision and noted that "[a]ll comments received timely after entry of the Board's decision have been made a part of the record and have been considered." *Id.* The Administrator framed the issue before him as follows:

The issue is whether, pursuant to 42 CFR 412.118(g)(1), the Intermediary properly excluded, for purposes of the Provider's indirect medical education (IME) adjustment, the time interns and residents spent at clinics which were determined to be

"freestanding" clinics under 42 CFR 405.-502.

(A.R. 2). In analyzing the record, the Administrator noted:

The clinics at issue in this case were classified as freestanding clinics rather than outpatient departments of the hospital by HCFA's Regional Office pursuant to a request by the Kentucky Medical Services Foundation (KMSF). KMSF requested that these clinics not be subject to the limitation of reasonable charges for services rendered in hospital outpatient departments. The Intermediary consequently excluded the residents and interns working in these clinics from the IME calculation because they were determined to be furnishing services in a freestanding clinic on the day that the intern and resident count was made.

(A.R. 7).

Upon a review of the entire record, the Administrator concluded that the Intermediary had properly excluded the time spent by the residents and interns in the Hospital's Clinics for the following reasons:

... The Administrator finds, however, that an examination of the legislative history, the statute and the regulations regarding the TEFRA charge limitation does not support the Provider's allegation that it could be an outpatient department of the hospital for IME purposes and simultaneously be exempted from the TEFRA cost limitations for physician services rendered in an outpatient setting.

(A.R. 7). The Administrator further explained:

Moreover, in applying the rules of statutory construction to the statutory and regulatory scheme outlined above, the time spent by interns and residents in clinics which are freestanding for purposes of the TEFRA charge limitation cannot be counted as time spent in outpatient departments of the hospital for purposes of the IME adjustment. A general rule of statutory construction is that statutes *in pari materia* must be construed together. Unless otherwise defined by Congress, 'hospital outpatient department' has the same

meaning in both enactments. Thus, it would be contrary to Congressional intent to allow clinics that are not considered to be outpatient departments of the hospital under TEFRA, to be considered outpatient departments of the hospital under CO-BRA.

.       .       .       .       .

It is uncontroverted that in this case the clinics were classified as freestanding under TEFRA for purposes of Medicare reimbursement. As a result, the clinics were reimbursed both the professional and overhead component for physician services on a Part B reasonable charge basis without the imposition of the TEFRA physician charge limitation for outpatient services. Thus, the direct and indirect costs of operating the clinic were included in the charges made for services furnished in these clinics. To treat these clinics as freestanding clinics for purposes of the TEFRA charge limit and as outpatient departments of the hospital for purposes of the IME adjustment would result in duplicate payment by Medicare for IME costs. Consequently, the Administrator determines that the Intermediary properly excluded from the IME calculation those interns and residents providing services at clinics determined to be freestanding under TEFRA. (A.R. 9–11).

## III. THE CROSS MOTIONS FOR SUMMARY JUDGMENT

### A. *Standard of Review*

■ Judicial review of the Secretary's final decision is governed by 42 U.S.C. § 1395oo(f), which incorporates the standards of Section 706 of the APA, 5 U.S.C. § 706. *See Carraway Methodist Medical Center v. Heckler,* 753 F.2d 1006 (11th Cir. 1985). The Court's review of the Secretary's decision is to determine whether the Secretary's decision is arbitrary, capricious, an abuse of discretion, contrary to law, or unsupported by substantial evidence in the record taken as a whole. *Id.* at 1009.

■ In reviewing such legal questions, the Court must accord deference to the interpretation of the agency charged with the administration of a statute. *Connecticut Dept. of Income Maintenance v. Heckler,* 471 U.S. 524, 532, 105 S.Ct. 2210, 2214–15, 85 L.Ed.2d 577 (1985); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982). The Court is required to uphold an agency's interpretation of a regulation it has been authorized to promulgate unless the agency's interpretation is so plainly erroneous or so inconsistent with either the underlying regulation or statute as to be arbitrary, capricious, an abuse of discretion or otherwise contrary to law. *National–Southwire Aluminum Co. v. United States Environmental Protection Agency,* 838 F.2d 835, 838 (6th Cir.1988), *cert. denied,* 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988); *United States v. City of Painesville,* 644 F.2d 1186, 1190 (6th Cir.1981), *cert. denied,* 454 U.S. 894, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981).

The foregoing principles of statutory construction apply with particular force in the field of Medicare reimbursement. *Carraway, supra* at 1009; *Homan & Crimen, Inc. v. Harris,* 626 F.2d 1201, 1211 (5th Cir.1980), *cert. denied,* 450 U.S. 975, 101 S.Ct. 1506, 67 L.Ed.2d 809 (1981); *Abbott–Northwestern Hospital, Inc. v. Schweiker,* 698 F.2d 336, 340 (8th Cir.1983). This point of law is succinctly stated in *Cheshire Hospital v. New Hampshire–Vermont Hospitalization Service, Inc.,* 689 F.2d 1112 (1st Cir.1982), wherein the First Circuit stated:

Moreover, in this case appellant is challenging an agency's interpretation of its own regulation. It is well settled that in such cases courts should afford considerable respect to the agency's interpretation. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797 63 L.Ed.2d 22 (1980). Generally, such an interpretation is of controlling weight, unless the reviewing court determines that it is plainly erroneous or inconsistent with the regulation. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). **Deference is particu-**

**648**

larly appropriate in an area that is as complex as the field of Medicare reimbursement. (emphasis added).

*Id.* at 1117.

■ The Court is also obligated to defer to an agency's evidentiary determinations made after an administrative hearing. The agency's factual conclusions need only be supported by substantial evidence in the record. *Boylan v. United States Postal Service,* 704 F.2d 573 (11th Cir.1983). Even though there may be conflicting evidence in the record that would support a contrary decision and even though the Court may disagree with the Secretary's findings, the Court is required to uphold the Secretary's decision if is supported by substantial evidence. *Faulkner Hospital v. Schweiker,* 537 F.Supp. 1058, 1064 (D.Mass.1982), *aff'd,* 702 F.2d 22 (1st Cir.1983); *accord, American Hospital Mgmt. Corp. v. Harris,* 638 F.2d 1208, 1211 (9th Cir.1981).

■ However, on the other hand, the Court's deference to an agency's interpretation of its own regulations is not total. A reviewing court must not "rubber-stamp" administrative decisions. *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting *NLRB v. Brown,* 380 U.S. 278, 291–292, 85 S.Ct. 980, 988–89, 13 L.Ed.2d 839 (1965)). The *Cheshire Hospital* Court explained:

> ... We still must examine the agency's interpretation to determine if it is consistent with the language of the regulation and with the purpose which the regulation is intended to serve. *Northern Indiana Public Service Co. v. Porter County Chapter of the Izaak Walton League of America, Inc.,* 423 U.S. 12, 15, 96 S.Ct. 172, 173, 46 L.Ed.2d 156 (1975); *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 131 (9th Cir.1980). Should we decide to accept the agency's interpretation of its own regulation, we must then consider whether the regulation so interpreted is consistent with the statute under which it is promulgated. *See United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977). Regulations which are inconsistent with the statute, or

contrary to the manifest purposes of Congress in enacting the statute, must be set aside as contrary to law. *Id.; Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974).

689 F.2d at 1117–18.

The Court is also cognizant that the United States Supreme Court has noted that where the Secretary's interpretation of a Medicare statute "so closely fits 'the design of the statute as a whole and ... its object and policy,' courts should be especially reluctant to reject it." *Good Samaritan Hospital v. Shalala,* —— U.S. ——, ——, 113 S.Ct. 2151, 2161–63, 124 L.Ed.2d 368 (1993) (quoting *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001–02, 108 L.Ed.2d 132 (1990)).

With this standard in mind, the Court will proceed to evaluate the cross motions for summary judgment.

**B.** *The Hospital's position*

■ The Hospital urges that the Secretary's decision is arbitrary, capricious, not supported by substantial evidence, and contrary to law. The Hospital points out that it is uncontroverted that no changes occurred in the licensure, accreditation, structure or management of the Clinics between 1983, when the HCFA Regional Office determined that the Clinics were a part of "the hospital outpatient department," and 1985, when the HCFA Regional Office determined that the Clinics were "free-standing." (A.R. 105, 360–362). The Hospital argues that the Secretary's determination that the Clinics are freestanding is based solely on the fact that the Hospital's physicians practicing in the Clinics were granted an exemption in 1985 from the outpatient charge limitation imposed on physician reimbursement by Section 104 of TEFRA.

The Hospital contends that there is simply no evidence to support the Secretary's decision that the Clinics in question are freestanding and that it was unnecessary for the Secretary even to make such a determination in granting the request of the Clinic's physicians to be exempted from the Section 104 TEFRA limitation, since the Clinic's physi-

cians were responsible for all of the overhead costs of operating the Clinics. The Hospital states that the only reason KMSF requested an exemption from the TEFRA limitation in 1985 is because the Clinics were part of the Hospital but the Clinics' physicians bore all of the overhead costs. The Hospital alleges that the Clinics' physicians desired to preserve their relationship with the Hospital and still comply with the provisions of TEFRA. The Hospital insists that had the Clinics already been determined to be freestanding, there would have been no need for the physicians to request the exemption from TEFRA because the TEFRA charge limitation would not have been applicable to the Clinics' physicians. (A.R. 301).

Furthermore, the Hospital argues that the questionnaire the HCFA Regional Office requested it to complete as part of the process of applying for the TEFRA exemption was not developed for the purpose of determining whether the TEFRA outpatient charge limitation should be applied and that it was a pre-existing questionnaire that the Secretary had used for a different purpose. (A.R. 593–598; 151–153). The Hospital contends that the only relevant question that needed to be answered in considering the Clinics' request to be exempted from the TEFRA limitation was whether there was duplicate reimbursement of overhead costs and that the statements made by the Secretary in exempting the Clinics from the TEFRA limitation that the Clinics were "free-standing" and "not to be considered for Medicare reimbursement purposes as a part of the University Hospital" were gratuitous and erroneous.

In support of its argument that the Clinics are part of the outpatient department of the Hospital, the Hospital relies chiefly on *University of North Carolina d/b/a The North Carolina Memorial Hospital v. Bowen,* No. C–87–427–D, 1988 WL 235549 (M.D.N.C. June 8, 1988), [1989–1 Transfer Binder] Medicare & Medicaid Guide (CCH) Paragraph 37,432 (A.R. 515), *aff'd,* 887 F.2d 1082 No. 88–2894 (4th Cir.1989) (A.R. 520). The Hospital also relies on *The Pennsylvania State Univ., Trustees for the Milton S. Hershey Medical Center v. Secretary,* No. 80–123 (M.D.Pa. March 2, 1981), [1981–1 Transfer Binder] Medicare & Medicaid Guide (CCH) Paragraph 30,898, and *Hennipin County Med. Ctr. v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Missouri,* PRRB Dec. No. 91–D80 [1992–1 Transfer Binder] Medicare & Medicaid Guide (CCH) Paragraph 39,803 (Sept. 18, 1991).

## C. *The Secretary's position*

The Secretary contends that the decision that a hospital clinic must be treated consistently either as freestanding or as a hospital outpatient department for all Medicare reimbursement purposes is supported by the Medicare Act, the legislative history of the Medicare Act and the regulations promulgated under the Medicare Act. The Secretary argues that Plaintiff's treatment of the Clinics in the Medical Plaza as hospital outpatient departments for Medicare reimbursement purposes would result in duplicative payment prohibited by Medicare law and policy.

Elaborating, the Secretary states that Section 104 of the TEFRA Amendment, which authorized limitations on charges for services rendered in hospital outpatient departments, and Section 9104 of the COBRA Amendment, which authorized counting residents in hospital outpatient departments for purposes of increasing a teaching hospital's IME payment, must be interpreted consistently in order to avoid duplicative payments by Medicare. The Secretary urges that such duplicative payments can only be avoided if the Clinics in this case are treated either as hospital outpatient departments or as freestanding for both reimbursement purposes.

The Secretary explains that Congress designed the IME adjustment as a measure to reimburse teaching hospitals for their increased indirect costs occasioned by the fact that the teaching process necessarily results in increased costs due to (1) the additional tests and procedures ordered by residents and interns undergoing on-the-job training that more experienced physicians would recognize were not needed, and (2) the provision of more extensive services to patients in teaching hospitals. (A.R. 258–261, 477–478). The Secretary notes that when an outpatient setting is treated as freestanding for pur-

poses of the TEFRA limitation on charges provision, the physicians are paid on a full charge basis for each test and procedure performed, and the payment is intended to compensate the physician for the professional services, the overhead costs, and a profit factor. Further, the physicians can bill separately for each test and procedure performed and are thus fully compensated for every additional test and procedure which may be done at the residents' request.

The Secretary submits that to treat the Clinics in question as hospital outpatient departments for purposes of increasing the IME adjustment by accounting for overhead costs of these additional tests and procedures a second time would result in a duplicative payment for these services. In the eyes of the Secretary, such treatment not only violates Sections 104 and 108 of TEFRA, but is also wholly inconsistent with the purposes of Section 9104 of COBRA, since the Hospital incurs no costs in the Clinics in the Medical Plaza.

In support of her position, the Secretary points to the preamble to the final IME regulations, wherein the Secretary recognized the opportunity for duplicative payments if IME payments were allowed to be increased by counting residents in freestanding clinics. This preamble states:

> Congress was concerned that teaching hospitals might be adversely affected by the implementation of the prospective payment system because these hidden costs would not be reflected in the prospective payment system rates as costs were standardized as the system moved toward a national payment rate applicable to all hospitals.... However, this rationale does not extend to excluded units or to freestanding family practice centers.... Services furnished in freestanding clinics are payable on a Part B reasonable charge basis. The direct and indirect costs of operating the clinic are included in the charges made for services furnished there.... [M]aking an additional payment under the provisions of the indirect medical education adjustment to reflect the presence of interns and residents would be a **duplicative payment.**

50 Fed.Reg. 35681 (1985) (September 3, 1985) (emphasis added).

The Secretary points out that there is no dispute that in this case for FYE June 30, 1987, the Clinics were classified by HCFA as freestanding rather than as outpatient departments and were reimbursed for both the professional services and overhead costs (including the costs relating to the interns and residents) for all tests and procedures, as well as any additional tests and procedures requested by the residents and interns, since the physicians billed separately for each test and procedure. Therefore, the Secretary argues, to allow the Hospital to reclassify the Clinics during the same fiscal year as hospital outpatient departments and thus increase its IME reimbursement by accounting for these same overhead costs and the same additional tests and procedures in its IME adjustment is precisely the type of duplicative payment expressly prohibited by Section 104 of TEFRA and the Medicare Act generally. *See Board of Trustees of State Institutions of Higher Learning v. Sullivan,* 763 F.Supp. 178, 192 (S.D.Miss.1991).

Further, the Secretary submits that the case chiefly relied on by the Plaintiff, *University of North Carolina d/b/a The North Carolina Memorial Hospital v. Bowen, supra,* is factually and legally distinguishable and therefore not controlling. The Secretary also contends that the other two cases on which the Plaintiff relies, *The Pennsylvania State Univ., Trustees for the Milton S. Hershey Medical Center v. Secretary, supra,* and *Hennipin County Med. Ctr. v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Missouri, supra,* are also not relevant to this action.

### Analysis

In 1985, when KMSF again applied to the HCFA for an exemption from the TEFRA cost limitation, HCFA requested KMSF to complete a questionnaire and advised KMSF that the information provided in this questionnaire would be used to determine whether the Clinics qualified for the requested TEFRA exemption. In response, KMSF submitted certain information designed to shed light on the relationship between the Clinics and the Hospital. (A.R. 594–598).

Although much of this information indicated that the Clinics still had close ties to the Hospital, several factors mentioned by KMSF led HCFA to conclude that the Clinics qualified as freestanding clinics for purposes of the regulations implementing Sections 104 and 108 of TEFRA. *Id.* For example, the information submitted indicated that the Clinics and the Hospital are not operated under common management and are, for the most part, located in separate buildings connected by an overhead walkway. KMSF also indicated that ongoing efforts were being made to identify the Clinics as being separate from the Hospital. Further, the questionnaire responses stated that Clinic medical records are separate from inpatient records and that the Clinics have billed as physician-directed clinics since 1979. *Id.*

■ After evaluating the information KMSF submitted to HCFA in support of its request for an exemption from the TEFRA limitation, on October 22, 1985, HCFA granted the request for an exemption from the TEFRA charge limitation based on its finding that the Clinics should be treated as freestanding and not leased outpatient departments. (A.R. 723). In granting this request, HCFA specifically found that the Clinics met "the criteria of free-standing, i.e., an independent clinic not to be considered for Medicare reimbursement purposes as a part of the University Hospital." *Id.* Thus, it is clear that in October 1985, the Hospital knew that in granting KMSF's request to exempt the Clinics from the TEFRA limitation, the Secretary, through HCFA, had determined that the Clinics were freestanding and **were not to be considered for Medicare reimbursement purposes as a part of the University Hospital.** There is no indication of record that the Hospital attempted to challenge the Secretary's finding that the Clinics were freestanding for all purposes of Medicare reimbursement until nearly two years later, when the Intermediary made adjustments to the Hospital's requested IME reimbursement for FYE June 30, 1987.

A review of the complex Medicare statutory scheme and regulations indicates that the Secretary is statutorily required to make distinctions between Part A and Part B costs and to eliminate duplicative costs in the outpatient area. In response to this charge by Congress, the Secretary has met these worthwhile objectives through the adoption and enforcement of the TEFRA and COBRA regulations. Thus, it is clear that in order to grant KMSF's request to exempt the Clinics from the TEFRA limitation, the Secretary was required to determine that the Clinics should be classified as freestanding in 1985.

At first glance, *University of North Carolina d/b/a The North Carolina Memorial Hospital v. Bowen, supra,* on which the Hospital heavily relies, appears to be relevant and directly on point in supporting the Plaintiff's argument; however, upon closer inspection, the Court concludes that the *North Carolina* case is factually and legally distinguishable in several respects. First of all, the issue in *North Carolina* was whether the salaries paid by the hospital to the residents for services rendered in certain outpatient clinics for the years 1980–1983 were reasonable costs contributing to the quality of patient care in the hospital pursuant to 42 C.F.R. § 413.85. Thus, *North Carolina* concerned the reimbursement of direct medical expenses rather the reimbursement of indirect medical expenses. As noted by the Sixth Circuit in *University of Cincinnati v. Bowen,* 875 F.2d 1207 (6th Cir.1989), for the period of time at issue in *North Carolina,* 1980–1983, the Medicare statute did not address direct medical education costs, and the regulations made no distinction for reimbursement purposes on the setting where the training was received; instead, the regulations focused on whether the training contributed to the quality of patient care in the hospital. *Id.* at 1211. However, subsequently, the direct medical education statute was amended in 1986 to expressly state that the setting in which the training activities were performed was irrelevant for purposes of determining direct medical education costs, so long as the activities related to patient care.

*North Carolina* is also distinguishable because both the regulations and the statute referenced therein, 42 U.S.C. § 1395ww(h)(4), are not applicable to the present action. Unlike the direct medical

education statute at issue in *North Carolina*, the IME statute concerned herein, 42 U.S.C. § 1395ww(d)(5)(B)(iv), expressly recognizes the importance of the setting in that it allows residents in a hospital's outpatient department to be counted in determining the IME adjustment. The regulation at issue herein also specifically provides that time spent by residents in the hospital's outpatient department for purposes of the IME adjustment and that the residents' time spent in free-standing clinics shall **not** be included in the IME computation. 42 C.F.R. § 412.118. Congress implicitly approved the importance of the setting, *viz.*, whether a facility was a hospital's outpatient department or a free-standing clinic, when in 1986, it repealed only that portion of the regulation that excluded time spent by residents in outpatient departments in calculating the IME adjustment.

Another distinction between *North Carolina* and the present action is that unlike the statute in *North Carolina*, the IME statute in the present action does not focus on costs incurred by the Hospital. To reiterate, Congress designed the IME statute as a measure to reimburse teaching hospitals for certain increased costs that were attributable to the increased number of tests and procedures ordered by residents and the provision of more extensive services to patients in teaching hospitals. (A.R. 258–261, 477–478). In the present action, the Hospital has incurred no additional costs due to the presence of interns and residents in the Clinics because these costs are borne by the physicians and are separately charged to the Medicare program under Part B. Further, the Clinics' physicians also do not incur these additional costs since they are permitted to submit additional charges for these extra tests.

For all of the foregoing reasons, *North Carolina* is not applicable to the present action.

Having reviewed the other cases on which Plaintiff relies, *The Pennsylvania State Univ., Trustees for the Milton S. Hershey Medical Center v. Secretary, supra,* and *Hennipin County Med. Ctr. v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Missouri, supra,* the Court also concludes that they are not relevant and controlling. *Pennsylvania State University* and *Hennipin County* both address the same type of reasonable cost reimbursement analysis that was seen in *North Carolina,* and neither of these cases contained the analysis required by the IME statute. Furthermore, *Pennsylvania State University* was decided before the enactment of Sections of 104 and 108 of TEFRA; therefore, even if *Pennsylvania State University* were factually on point, it is now irrelevant to the issue presented herein and the analysis required by the IME statute. Therefore, the Court concludes that Plaintiff's reliance on *Pennsylvania State University* and *Hennipin County* is likewise misplaced.

## IV. CONCLUSION

Based on a review of the administrative record and the applicable case law, the Court is of the opinion that the Secretary's final decision in respect to the adjustments made to the IME calculation is supported by substantial evidence and must be affirmed. In reaching this conclusion, the Court is cognizant that the Secretary was presented with conflicting evidence that would also have supported a decision favorable to the Hospital. However, it is the province of the Secretary rather than the Court to resolve conflicting evidence presented in the administrative record below.

In summary, it is clear that in 1985, when KMSF again requested that the Clinics in the Medical Plaza be exempted from the TEFRA cost limitation, HCFA supplied KMSF with a questionnaire to complete and advised KMSF at that time that the questionnaire responses would be used in determining whether the Clinics qualified for the requested exemption. Based on the information gleaned from this questionnaire, HCFA concluded that the Clinics qualified for the TEFRA exemption because the Clinics were freestanding, as seen in HCFA's letter to KMSF on October 22, 1985, which advised KMSF that the Clinics met the criteria of freestanding, which the letter defined as "an independent clinic not to be considered for Medicare reimbursement purposes as a part of the University Hospital." (A.R. 723). It

is significant that the Hospital failed to challenge HCFA's finding that the Clinics were freestanding until nearly two years later, when the Intermediary made adjustments to the Hospital's IME calculation for FYE June 30, 1987.

Given the complexity of the Medicare statutes and regulations, the Court finds that it is entirely reasonable for the Secretary to classify a facility as either a hospital outpatient department or as a freestanding clinic for all purposes of Medicare reimbursement. Administrative chaos would reign if a facility were classified as a hospital outpatient department for some purposes of Medicare reimbursement and also simultaneously classified as a freestanding clinic for other purposes of Medicare reimbursement.

Accordingly, the Court concludes that the Secretary is entitled to summary judgment. An Order and Judgment consistent with this Memorandum Opinion will be entered on the same date herewith.

### ORDER AND JUDGMENT

In accordance with the Memorandum Opinion entered on the same date herewith,

**IT IS HEREBY ORDERED** and **ADJUDGED,** as follows:

1. The motion of the Plaintiff, University of Kentucky, for summary judgment (Docket Entry # 15) is **DENIED.**

2. The motion of the Defendant, Secretary of Health and Human Services, for summary judgment (Docket Entry # 20) is **GRANTED.**

3. The Secretary's final decision below reinstating the Intermediary's calculation of the Hospital's IME adjustment is supported by substantial evidence and is **AFFIRMED.**

4. All issues having been resolved, this action is **DISMISSED** and **STRICKEN** from the docket.